[No. 24931.   Department Two.   March 7, 1934.]

THE STATE OF WASHINGTON, *on the Relation of G. W. Hamilton, Attorney General, Respondent,* v. JAY THOMAS *et al., Appellants.*[1]

*Geo. H. Crandell,* for appellants.

*The Attorney General* and *John W. Hanna, Assistant,* for respondent.

TOLMAN, J.—The *Attorney General* instituted this action to recover certain moneys which came into the hands of the defendant Jay Thomas as public printer,

[1]Reported in 30 P. (2d) 373.

which moneys were on deposit with the defendant bank. A judgment was prayed for against Thomas and the community for the amount of these funds, and a lien thereon binding upon the defendant bank was demanded. From a judgment as prayed for, the defendants Thomas and wife have appealed.

Since no question of fact is raised in this court, the trial court's findings will form a sufficient basis for the discussion of the questions of law now relied upon.

Omitting the formal parts, the findings are:

"That on the 8th day of March, 1925, the above named defendant Jay Thomas, was the duly appointed, qualified and acting state printer of the state of Washington, having theretofore been appointed to said office by Roland H. Hartley, then Governor of the state of Washington. That on the 8th day of March, 1925, the above named defendant Jay Thomas in furtherance of a plan tending to the acquiring by the state of Washington of the printing plant then being operated by the said defendant Jay Thomas as state printer, and O. M. Green, R. V. Ankeny and D. H. Moss as trustees, entered into a certain trust agreement which was signed and executed by said parties on the 20th day of March, 1925, by the terms and conditions of which the said defendant Jay Thomas as state printer of the state of Washington and said trustees agreed and obligated themselves to purchase, operate, conduct and carry on said printing plant then used by the said state printer and the said trustees named in said agreement agreed and obligated themselves to advance the sum of thirty thousand dollars ($30,000) in order to acquire title to the said printing plant and to create a working fund for the purpose of carrying on and conducting said printing plant and the said defendant Thomas agreed and obligated himself to draw no more than the sum of five hundred dollars ($500) per month as and for salary as state printer and to account for the gross income and expenditures of said business, the said trustees giving, and granting unto the said state printer

the use of said plant during the time he should hold office as state printer, and that the gross receipts received from the operation of said printing plant and use of same were to be applied first to the cost of operation and upkeep of said plant, including five hundred dollars ($500) per month as salary to the state printer and to the payment of principal and interest upon the said sum of thirty thousand dollars ($30,000) theretofore advanced by said trustees in the acquiring of said printing plant and the creating of a working fund together with all costs for bonds and insurance premiums and costs for accounting, and that the accumulating and accumulated net proceeds derived from the operation of said plant over and above the cost incident to the trust and necessary obligations in the execution thereof, was to be carried in a separate account bearing interest in the name of the trustees but in trust nevertheless to be tendered to the legislature of the state of Washington for the benefit of the state at the expiration of the term of the then governor, Roland H. Hartley, it being further provided in said trust agreement that if said printing plant was sold by said trustees any sum derived from such sale was likewise to be tendered to the state of Washington for the benefit of the state.

"That on or about the first day of February, 1929, the said defendant Jay Thomas as state printer and O. M. Green, R. V. Ankeny, being two of the trustees named in the original trust agreement and C. H. Howell who had succeeded as trustee D. H. Moss, named in the original trust agreement, entered into a supplemental agreement wherein it was agreed that the said defendant Jay Thomas as state printer should continue the operation of said printing plant in accordance with the terms and conditions of said original trust agreement which said original agreement was referred to in the said supplemental agreement and by reference made a part thereof.

"That from and after the execution of said trust agreement the said defendant Jay Thomas did continue as state printer of the state of Washington, continuously up unto the first day of April, 1933, and con-

tinued to carry on and operate said printing plant until April 1, 1933, and pursuant to the terms and conditions contained in said trust agreements he together with the said trustees tendered to the twenty-first legislature of the state of Washington, the sum of $8,592.65 representing the net proceeds realized from the operation of said printing plant up unto the date of said tender and that the said sum was accepted by the legislature of the state of Washington for and on behalf of the said state.

"That following out the provisions contained in said trust agreements and by virtue of same, the said defendant Jay Thomas and said trustees tendered to the state of Washington at the convening of the legislature of said state, Session of 1931, the further sum of $14,-242.28 which said sum represented the net proceeds derived from the operation of said printing plant from the date of the previous tender up until that time and that the legislature of the state of Washington rejected and refused to accept said sum and that the same was redeposited in the Olympia National Bank of Olympia, Washington, which said bank was subsequently taken over for liquidation by the Comptroller of the Currency of the United States and placed in the hands of a receiver.

"That on the 9th day of January, 1933, the said defendant Jay Thomas together with the said trustees named in the supplemental agreement executed and delivered under their hands and seals a bill of sale and assigning to the state of Washington certain personal property therein described being the personal property and equipment of the printing plant referred to in said agreements together with the account of Jay Thomas, public printer, carried in the trust fund in the Olympia National Bank in the sum of $14,242.28 being the fund theretofore tendered to the 1931 legislature and the further sum of $4,459.88 in the name of Jay Thomas, public printer, also in said Olympia National Bank and the account of Jay Thomas, public printer, in the Capital National Bank of Olympia, Washington, which said bill of sale also contained the recommendation that the legislature accept the printing plant and accounts

mentioned and that thereafter the said plant be operated and the proceeds thereof be handled in a manner similar to that used during the administration of Roland H. Hartley, as Governor of the state, namely, that the printer's salary shall not exceed $6,000 per annum payable monthly and that all monies earned by the public printer over said amount and the operating costs including necessary upkeep and replacements shall be paid into the general fund of the state of Washington.

"That on the 7th day of March, 1933, the legislature of the state of Washington enacted chapter 97, of the Session Laws of 1933, which said act was approved by the Governor on March 14, 1933, and by the terms of said act the bill of sale and assignment executed by the said defendant Jay Thomas and said trustees on the 9th day of January, 1933, was accepted together with all the property therein described, and it was further provided in said act that the operation of said plant by said Jay Thomas, public printer, at the option of the Governor be continued until April 1, 1933 upon the terms and conditions as set forth in said bill of sale.

"That the net proceeds of said printing plant between March 7, 1925 and January 10, 1933 was the sum of $102,942.71 and that between the dates of March 7, 1925 and January 10, 1933, the said defendant Jay Thomas and said trustees tendered and paid to the state of Washington, in accordance with the terms and conditions of said trust agreement, the sum of $97,-611.35 leaving a balance due the state of Washington under the terms and conditions of said trust agreement in the sum of $5,331.36.

"That between the 11th day of January, 1933 and the 14th day of March, 1933, being the date of approval of chapter 97, Session Laws of 1933, by the Governor of the state of Washington, the net proceeds derived from the operation of said plant was the sum of $5,347.10; that the net proceeds of said plant between March 15, and March 31, 1933, inclusive was $281.77.

"That defendants Jay Thomas and wife make no claim to said sum of $281.77 being the net proceeds derived from the operation of said plant between the

dates of March 15, and March 31, 1933 inclusive but claim to be the owners of and entitled to the said sums of $5,331.36 and $5,347.10 and have refused and still continue to refuse to pay said sums or any part thereof into the treasury of the state of Washington or to turn the same over to the said state of Washington.

"That the said several sums, to-wit, $5,331.36, $5,347.10 and $281.77, aggregating in all the sum of $10,960.23, are now on deposit with defendant Capital National Bank, a corporation, which said defendant is ready, able and willing to pay same to the state of Washington or any person lawfully entitled thereto."

These facts may be briefly summarized so as to bring out the particular points which may be important.

(1) Departing from the practice theretofore obtaining, Thomas, as public printer, instead of furnishing his own printing plant, arranged with the trustees to advance money to buy the plant of his predecessor, to hold title until their advances were repaid, and thereafter to tender the title to the plant to the state; Thomas, in the meantime, contracting to draw from the earnings of the plant not more than five hundred dollars per month for his personal services. This, as between the parties, was a good and enforcible contract, based upon a sufficient, valuable consideration. The state was not a party to it, and whether the state, on the theory that the contract was made for its benefit, could have enforced the contract in any part, it is not now necessary to determine.

(2) The contract was carried out by the parties, the plant paid for itself, an excess was earned and tendered to the legislature of 1929, which, by chapter 91, Laws of 1929, p. 176, accepted the money so tendered and placed it in the general fund.

(3) In the next biennium, still operating under the terms of the contract, the printing plant earned a surplus of over fourteen thousand dollars, which was ten-

dered to the legislature of 1931. That legislature did not act upon the tender, but the tender was kept good, and title to that sum has since been accepted by the state under the act of 1933 hereinafter referred to. The sum so earned and tendered to the legislature of 1931 is in no way involved in this litigation.

(4)  At the time of the convening of the 1933 legislature, Thomas and the trustees executed and tendered to the state a conveyance of the printing plant and its accessories, and Thomas also tendered the surplus earned and received up to that time by the operation of the plant under the terms of the contract; and in due course the legislature accepted these tenders by chapter 97, Laws of 1933, p. 409.

(5)  After the 9th day of January, 1933, the date of the conveyance and tender referred to in the preceding paragraph, certain funds earned prior to that time came into the hands of appellant Thomas as public printer, and such of those funds as were surplus were deposited with the defendant bank and form a part of the fund now in dispute.

(6)  After the tender on January 9, 1933, and before the taking effect of chapter 97, Laws of 1933, p. 409, on March 14, 1933, the plant, operating as before, earned other monies, resulting in a further surplus, which also was deposited in the defendant bank and became a part of the fund now in dispute.

(7)  After the 14th day of March, 1933, when chapter 97, Laws of 1933, p. 409, took effect, and before appellant Thomas surrendered his office as public printer, the plant earned a further surplus of $281.77, which was also deposited in the defendant bank, but as to that no question is here raised, the defendants by their answer tendering that sum to the state.

We have specified with some care how the sum now

on deposit was accumulated and the differing conditions as to each part, but, as we now see it, the same rule of law is applicable to each part and portion of the fund.

The office of public printer, as it existed at the time Mr. Thomas took office and up to a few days before he retired, is, of course, a statutory one, and the manner of appointment, qualification, and the duties to be performed, together with the rate of payment for his finished work and reimbursement for materials used on behalf of the state, are all distinctly specified by the statutes, Rem. Rev. Stat., §§ 10323 et seq.

Reading the whole series of enactments together, it will be seen that the public printer, during the period we are considering, was appointed for no specific term, and held his office solely at the pleasure of the governor. To perform the work required of him, he was obliged to have at his disposition a modern printing plant which, from the record before us, would seemingly require a capital investment of at least thirty thousand dollars. He manifestly could do little or none of the actual productive work, and no doubt mere supervision would occupy him fully and exclusively. He was paid for work produced at rates fixed by the statute, and what the state paid he must first use to pay wages to the workmen who actually set the type, operated the presses, the bindery, and the like. All other operating and overhead expenses, including repairs to the plant, would have to be paid. Presumably, the capital invested must earn a fair rate of interest, and if anything remained after all necessary outlays and expenses were fully discharged, that overplus, if any, was the compensation, or more correctly speaking, the profit accruing to the public printer.

While the statute uses the term "office of the public printer," it is at once apparent that, in practical effect, the public printer was not an officer in the constitutional sense, but was a contractor who undertook to do certain work at rates fixed by the legislature, and it is equally clear that the law did not guarantee him any profit or compensation therefrom or therefor, but left him by the exercise of skill and ability to make a profit if he could. Manifestly, if a public printer lacked ability and conducted the business at a loss, the state would owe him no compensation and would not be liable for the loss. The state's only duty would be to pay the statutory price for the work and material delivered to it.

It seems to us self-evident that the public printer was not the kind of a state officer, and his compensation was not the kind of compensation, with which our constitution is concerned.

Appellant cites a large number of authorities, each laying down a sound rule of law, but each, we think, inapplicable to the situation here presented. Among the cases cited are: *State ex rel. Davis v. Clausen*, 47 Wash. 372, 91 Pac. 1089; *State ex rel. Funke v. Board of Commissioners*, 48 Wash. 461, 93 Pac. 920; *State ex rel. Port of Seattle v. Wardall*, 107 Wash. 606, 183 Pac. 67. These cases all have to do with officers elected or appointed for a fixed term, who by law were to be paid a fixed and definite compensation.

It seems unnecessary to set out the familiar constitutional provisions upon which appellants rely or to pursue this line of inquiry further, because, as we see it, Mr. Thomas, as public printer, had his appointment been unconditional and if he had never entered into the contracts referred to in the findings, would still have had no compensation which the legislature might not have changed at will.

A contrary holding would either deprive the legislature of its power to control the state's printing and the price to be paid therefor, or would require the governor to remove a competent and satisfactory printer in order that a legislative act might take effect. While not based upon a similar state of facts, the case of *State ex rel. Thurston County v. Grimes,* 7 Wash. 445, 35 Pac. 361, lends support to these views.

There being no fixed term and no fixed compensation, the legislature might at will, as conditions changed, change the rate of pay or compensation for the state's printer and, of course, it could have, at any time, abolished the office of public printer. This seems to have been the legislative idea when, by the acts of 1917, Laws of 1917, chapter 129, p. 510 (Rem. Rev. Stat., § 10328), and 1919, Laws of 1919, chapter 37, p. 76 (Rem. Rev. Stat., § 10329), and the act of 1933, Laws of 1933, chapter 97, p. 409, material changes were made in compensation to the public printer, none of which were ever before questioned.

If, then, the public printer was not, before the act of 1933, within the protection of the constitution, it follows that, even though without legislative action he might not have been deprived of the profits accruing to him under the law, yet, having voluntarily tendered the excess above five hundred dollars per month and that tender having been accepted by solemn legislative act, such act, being clearly repugnant to the prior statute fixing compensation, must be held to have operated as a repeal of such prior inconsistent laws.

Section one of chapter 91, Laws of 1929, p. 176, reads:

"The state treasurer is hereby authorized and directed to accept, on behalf of the state, the certified check of the public printer for eight thousand five

554

hundred ninety-two dollars and sixty-five cents ($8,-592.65) which was tendered by the governor to the twenty-first legislature pursuant to authorization by the trustees of a certain trust created for the benefit of the state on March 20, 1925, by a certain agreement of trust executed March 20, 1925, between Jay Thomas, state printer, and O. M. Green, R. V. Ankeny and D. H. Moss, trustees. The state treasurer is hereby directed to pay the proceeds of said check into the general fund.''

This is the whole of the act save the emergency clause.

By the terms of this act, the legislature clearly recognized and accepted the terms and conditions of the trust agreement; it could not have accepted the money without recognizing and approving the means by which the money was made available. One of the most important features of the trust agreement was that the public printer should receive no more than five hundred dollars per month as his compensation, and that trust agreement, being thus accepted and ratified by the legislature, from thenceforth had the force and effect of statutory law, and the public printer became legally bound to comply with its terms. See *State ex rel. Jones v. Clausen,* 78 Wash. 103, 138 Pac. 653.

The failure of the legislature to act in 1931 left the situation in *statu quo.* Thus, the 1929 act continued in force until superseded by the act of 1933. It follows that the net profits realized by the public printer from and after the taking effect of the act of 1929 might be retained by him only to the extent of five hundred dollars per month. Any excess over that amount belonged wholly to the state.

The judgment is affirmed.

BEALS, C. J., MAIN, and STEINERT, JJ., concur.

BLAKE, J. (dissenting)—Trafficking in the emoluments of public office is almost universally frowned upon by the courts. Contracts conceived with that purpose are generally held to be void and unenforcible. Mechem, Public Officers, §§ 370, 371, 372. This court has so held in the following cases: *Rhodes v. Tacoma,* 97 Wash. 341, 166 Pac. 647; *Bell v. Mabton,* 165 Wash. 396, 5 P. (2d) 514; *State ex rel. Knez v. Seattle, ante* p. 283, 28 P. (2d) 1020.

In the first cited case, the court held that the manager of a sub-department of the city light department was a public officer, and could recover the balance of salary fixed by ordinance, notwithstanding he had, over a period of years, accepted a lesser sum, and acknowledged payment in full for his services. In the second case cited, the "water works commissioner" was held to be a public officer and entitled to recover the balance of salary fixed by ordinance, notwithstanding that, before appointment to the position, he agreed in writing to accept a lesser sum. The theory of these decisions is that, where the salary of a public officer is fixed by duly constituted authority, the compensation provided for cannot be changed by contract, or by any other than such authority—whether it be the state legislature or a city council. In the last cited case, we held that a fireman is a public officer, and that agreement made by him to accept less than the salary provided for by ordinance was void as against public policy.

The majority apparently concedes the rule, and predicates its holding, as I understand, upon two postulates which seem to me to be unsound. The first is that the public printer is not a public officer; the second is that the contract is a valid and binding agreement between the parties. To my mind, the only saving grace of the transaction is that the state was designed

to be the beneficiary under it. The iniquity of the contract would be clear enough if the controversy presented were between the parties to it over the emoluments of the office of which it was designed to dispose in a manner contrary to statute. Under the principle of the cases above cited, the state could not enter into such a contract. The fact that the contract was beneficent in purpose does not diminish the force of the principle, nor impair its applicability. It might have been (as such contracts usually are) conceived in iniquity. If the so-called trustees had made the advancements upon the stipulation that they were to have all the emoluments derived from state printing over and above five hundred dollars per month, would the court hold it valid? It would seem to me, clearly not.

The fact that the parties to the contract, in pursuance of its terms, executed the bill of sale and assignment of January 8, 1933, is a fortuitous circumstance. That instrument adds nothing by way of legalizing or validating the original contract. Had they failed to execute the bill of sale and assignment, what remedy would the state have had? It would be in the anomolous position (as it is now) of seeking to recover, by virtue of a private contract, payments authorized by statute. Laws 1917, chapter 129, p. 511, § 3, Rem. Rev. Stat., § 10329.

The respondent says in his brief:

"At the time the original trust agreement was entered and the supplemental agreement as well, the compensation of the state printer was fixed by statute. Sections 8616 to 8626, incl. Rem. and Bal. Code and Statutes. This being true and the office of state printer being a public office, any agreement fixing a different compensation is void as being against public policy."

He then seeks to sustain his position in this action on the theory that the assignment and bill of sale,

having been accepted by the act of the legislature (Laws 1933, chapter 97, p. 409), has rendered valid a contract which, in its inception, was void.

Of course, the assertion by the majority that the public printer is essentially not a public officer, but a sort of contractor, flies in the face of the statute (Laws 1905, chapter 168, p. 332, § 1), which provides:

"The office of public printer is hereby created, which office shall be filled by appointment, by the governor, and who, when appointed, shall hold office at the pleasure of the governor, until his successor is appointed and qualified." Rem. Rev. Stat., § 10323.

The fact that the legislature might have changed the method of compensating the public printer is alluded to by the majority as affording some support for its holding. The legislature, however, has not yet exercised that prerogative.

The original contract out of which this suit arises being void, the action should be dismissed. This court is committed to the rule that it will not lend its aid to the enforcement of void contracts, but will leave the parties where it finds them. 6 R. C. L. 820; *Reed v. Johnson,* 27 Wash. 42, 67 Pac. 381, 57 L. R. A. 404; *Stirtan v. Blethen,* 79 Wash. 10, 139 Pac. 618, 51 L. R. A. (N. S.) 623.